# LOUIS CONZELMAN, ET AL.
### vs.
# CITY OF BRISTOL, ET AL.

122 Conn. 218

Superior Court     Hartford County     File #53140

Present:   Hon. ERNEST A. INGLIS, Judge.

W..N. DeRosier,
Blodgett & Hausman,      Attorneys for the Plaintiff.

F. M. Beach,
F. V. Tracy,      Attorneys for the Defendant.

## MEMORANDUM FILED APRIL 8, 1936.

INGLIS, J.   This is an action brought by taxpayers of the City of Bristol praying for a declaratory judgment declaring the grand list of the City of Bristol for 1935 illegal and invalid and an injunction restraining the laying of a tax thereon.

It appears that said grand list was made up as follows:   In 1933 the General Assembly in a special act the primary purpose of which was to create a board of finance for Bristol authorized the city council to cause to be installed a system by which equitable and just values of real estate might be ascertained for assessment purposes and to enter into a contract for that purpose **(1933 Sp. Acts, Chap. 117, Sec. 93)**. Pursuant to that authority on October 16th, 1934 the City entered into the contract (Exhibit D) with The Municipal Service Co., Inc., by the terms of which the Company agreed to "install a scientific and equitable system for the assessment of property within the city which system so installed shall provide by way of assistance to the Board of Assessors, among other things, for tax maps and land value maps", etc.   The Company also agreed to instruct the assessors in the method of valuations in order that the system established may continue in the future.

In the performance of the contract the Company procured the appointment of a committee of three real estate men residents of Bristol to fix tentative unit land values.   This committee after investigation and hearings made up a schedule of unit land values consisting of basic front foot values in the thickly settled districts and basic acreage values for the rural districts.   These tentative values were then taken up with the assessors.   After considerable discussion most of the units of value were approved by the assessors and the rest were altered by the assessors so that the unit values finally adopted and adhered to were all approved by the assessors.

On the basis of these unit values, applied in accordance with fixed rules, the value of each taxpayer's land the dimensions and character of which had been ascertained by the

Company was figured by the Company and placed on a card under the name of the taxpayer.

So far as the valuation of buildings was concerned the following method was adopted: The Company measured up every building in the city. The Company after an exhaustive investigation of reproduction costs in Bristol arrived at unit valuations for the various types of construction and submitted those to the assessors for approval. In this matter the assessors relied very largely upon the judgment of Mr. Allaire, one of their number, and in the end approved through him a table of unit valuations. Applying this table to the various buildings the Company figured up a tentative valuation for each building of each taxpayer and entered those valuations upon the respective taxpayers' cards.

During the month of October, 1935, the assessors were engaged in taking in the taxpayers' lists. During most of November, they were busy putting valuations upon the personal property listed and late in November the cards prepared by the Company as above set forth began to come to the assessors' office. From then on until the end of January the assessors sat as a board on every business day. The system followed by them was substantially as follows: The assessors all sat around a table. Each taxpayer's card was taken by one of the assessors and checked over by him. Each of the assessors had been in office for a long period of years and was familiar with most of the property in the city. If, in checking over any card, any valuation thereon appeared to be out of line either with the unit values as agreed upon or with the general knowledge which the particular assessor had of the specific property, the assessor handling the card upon which that valuation appeared would discuss it with the other two assessors. Such discussions occurred with reference to a very large proportion of the taxpayers cards and the figures appearing on the cards were changed in the case of upwards of seven hundred taxpayers. Some changes were also made as result of various taxpayers calling to the attention of the assessors or the Company mistakes in the classification or size of their property. These changes were all at least approved by the assessors. In other words the checking over of the cards was not perfunctory but was done carefully and resulted in practically every questionable valuation as it appeared on the cards being brought to the attention of and discussed by

the whole board of assessors. When a valuation either had been accepted by the individual assessor handling the card or in case of doubt had been passed upon by the whole board, that valuation was entered upon the taxpayers list and became his assessment. In a considerable number of cases which came up for discussions near the end of January, the necessity of getting the abstract in order and balanced by February first prevented the entry of alterations decided upon by the assessors upon the respective lists and the abstract. These cases were taken care of by the assessors recommending the necessary changes to the board of relief. With exception of those cases the assessors assessed the various pieces of property at the value set by them in lists of the respective taxpayers and they made up the abstract and signed and swore to it in accordance with law.

The principal contention of the plaintiffs is that the grand list so made up is invalid because the assessment was done by the Municipal Service Company and not by the assessors. The facts of the case as summarized above do not warrant that conclusion. On the contrary it appears clearly that although the assessors depended largely upon the information as to the taxable property of the city collected and tabulated by the Company and in the main accepted the system and rules for figuring values which were suggested by the Company, nevertheless it was the assessors who did the assessing. It was the assessors who had the final say as to the unit values fixed for both land and buildings. They did accept, approve and adopt as their own the system for arriving at the value of specific property which had been suggested by the Company, and in the end when it came to applying the system to the figuring of the valuation of specific properties they not only applied the system but they checked its results against their own knowledge of the property. The conclusion is necessary, therefore, that the assessors did their full duty, that they took advantage of the information collected by the Company, and for the most part they made use of and applied the system and rules set up by the Company but that in the last analysis they in no way felt legally bound to use the information nor apply the system and that in doing so they made use of it only so far as their own judgment dictated that they should. The assessments were arrived at by the assessors and were their judgment rather than that of the

Company.

So far as equalizing the lists is concerned the mere application of the system is calculated to accomplish that. The assessors in checking over the cards made up in accordance with the system and in making such changes in them as they saw fit were not only assessing the property but they were at the same time equalizing the lists.

It follows that the grand list of 1935 was made up fully in compliance with law and is not invalid on the ground that it was not made by the assessors.

**Cheney vs. Essex, 83 Conn., 493.**

The second contention of the plaintiffs is that the Bristol grand list of 1935 is invalid because granting that it was made up by the assessors, they did not make it up in accordance with **Section 1142, General Statutes, Revision 1930.**

That section reads as follows:

"The assessors of all towns, consolidated towns and cities and consolidated towns and boroughs, unless otherwise provided, shall during each period of ten years after February 1930, view all of the real estate of their respective municipalities and shall revalue the same for assessment and, in the performance of these duties at least two of the assessors shall act together, and all valuations shall be separately approved by a majority of the assessors."

The last general revaluation for property for tax purposes which was had in Bristol was in 1925. It is clear from the records of the Council and Board of Finance that in entering into the contract with the Municipal Service Co., Inc., one consideration which those bodies had in mind was that, as they thought, the statute required a revaluation not later than 1935. It may be that those bodies expected that the services of the Company which were contracted for would be a substitute for the revaluation contemplated by the statute although there is no evidence which would justify such a conclusion.

It certainly is a fact that the assessors did not, during 1935, view all of the real estate in Bristol. It does not follow, however, that the grand list of 1935 is invalid.

Section 1142 provides for a procedure entirely out of the making up of any specific grand list. It does not require the assessors to reassess but rather to "revalue" for assessment purposes. It does not specify that after all of the viewing and revaluing of the property shall be done in one year. Its purpose is to provide that two of the assessors at least once in each decade after February 1930 shall view each property and put a valuation on it so that when the board comes to making up the grand list, either the next or any subsequent grand list, they will have in mind the proper figures at which the property should be assessed. If upon viewing the property they should put a valuation on it and then when they came to make up the grand list theyshould conclude that such valuation was wrong they certainly would not be bound to assess the property at that valuation. The revaluation contemplated by the statute therefore is not a prerequisite to he making up of any specific grand list by the assessors. It is a procedure mapped out for the education of the assessors to better qualify them to do the actual assessing of property when it comes to the making up of all of the grand lists.

Toof vs. New Haven, 73 Conn., 543.

Bradley vs. New Haven, 73 Conn., 646.

Slosberg vs. Norwich, 115 Conn., 578, 580.

That being the case it constitutes simply an affirmative direction to the assessors and does not go to the protection of the essential rights of any taxpayer with reference to any specific list. It is therefore directory rather than mandatory.

Bradley vs. New Haven, supra.

3 Cooley, Taxation (4th Ed.) Sec. 106.

59 C. J. 1074 (Statutes, Sec. 631).

Moreover, under the statute as it now stands, Bristol was not bound to have a revaluation in 1935. It is true that the last general revaluation in Bristol was had in 1925. That was made in accordance with Sec. 1153, Gen. St. Rev. 1918, which provided that "on or before February 1, 1920 and during each period of ten years thereafter" there should be a revaluation. In the Revision of 1930 the section was changed so as to read "during each period of ten years after February 1, 1930" there shall be a revaluation.

If the statute had remained in effect as it was in the Revision of 1918 there might be some question as to whether the ten year periods at some time during which revaluations were to be had was to start runing on February 1, 1920 or on the date of each successive revaluation. However, that may be, the statute as it now stands is perfectly plain. The legislature by adopting the revision with the modification as made by the revisors has wiped the slate clean as of February 1, 1930. **Section 1142 of the Revision of 1930** provides simply that at some time within the decade commencing February 1, 1930 the City of Bristol should have a revaluation. This section will be fully complied with by Bristol or any other town if it has a revaluation at any time prior to February 1, 1940. It is clear, therefore, that the mere failure to have a revaluation in Bristol in 1935 did not violate the statute and can in no way invalidate the assessment of that year.

A third ground of invalidity claimed by the plaintiffs is that the assessors failed to send out notices of increase in the assessments on personal property. This omission might offer a defense to the individual taxpayers in resisting the collection of the tax assessed on such personal property, but it can hardly be held to be sufficient to invalidate the whole grand list.

The plaintiffs further complain on argument that the Board of Relief upon request of the assessors reduced certain valuations without the taxpayers appearing and offering to be sworn. Suffice it to say that this complaint is not set forth in the complaint. Even though it were, the conduct of the Board of Relief in such particular would not invalidate the whole grand list.

It is therefore concluded that the Bristol Grand List is not invalid for any of the reasons claimed by the plaintiffs.

In view of that conclusion it is not necessary to pass upon the affirmative defense which is in substance that the plaintiffs either have waived their rights or are estopped to assert them because of the fact the named plaintiffs have all appealed their individual assessments to the Board of Relief. A word concerning it however, can do no harm. They certainly have not estopped themselves thereby because the City has not been put in any worse position by reason of such appeals.

They cannot be held to have waived their right to bring this action because it does not appear that they intended to make any such waiver. There was nothing inconsistent in their pursuing both remedies. Their position here is that the whole assessment is invalid, while before the Board of Relief it was that whether the assessment was valid or not, in any event, their respective assessments were too high. It is not a case of their relying at one time on some right which they then claimed had been validly granted to them and at another time relying on a claim that such right had not validly been given to them.

Although this action is, in part, one for a declaratory judgment, the principal relief which the plaintiffs sought was for an injunction. It is therefore an action in which costs being discretionary, should be taxed in favor of the prevailing parties.

Judgment may enter declaring that the grand list of the City of Bristol for 1935 is a legal and valid assessment list and that the defendants recover of the plaintiffs their taxable costs.